PREET BHARARA
United States Attorney for the
Southern District of New York
By:    ROBERT WILLIAM YALEN
         ELLEN LONDON
         Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2722/2737
Fax:    (212) 637-2702
Email: robert.yalen@usdoj.gov
         ellen.london@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                           :
UNITED STATES OF AMERICA,                     :
                                                           :
                        Plaintiff,                       :
                                                           :
              v.                                         :
                                                           :
DEUTSCHE BANK, A.G.; DB U.S. FINANCIAL  :
MARKETS HOLDING CORP.; DEUTSCHE       :
BANK SECURITIES, INC.; BMY ACQUISITION :
CORP.; BMY ACQUISITION LLC; BMY           :
STATUTORY TRUST; and FIRST UNION         :
NATIONAL BANK, n/k/a WELLS FARGO        :
BANK N.A., as trustee of BMY STATUTORY   :
TRUST,                                                  :
                                                           :
                        Defendants.                   :
-------------------------------------------------------------X

COMPLAINT

14 Civ. _____

**ECF CASE**

**JURY TRIAL DEMANDED**

        Plaintiff the United States of America (the "United States"), by its attorney, Preet

Bharara, United States Attorney for the Southern District of New York, alleges as follows:

INTRODUCTION

1.      In 2000, defendants Deutsche Bank, A.G. ("DB AG"), DB U.S. Financial Markets

Holding Corp. ("DBUSH"), and Deutsche Bank Securities, Inc. ("DBSI" and, collectively with

DB AG and DBUSH, "Deutsche Bank" or the "Deutsche Bank defendants") implemented a plan

to avoid payment of tens of millions of dollars of tax liabilities.  As described in more detail

below, Deutsche Bank participated in a series of transactions with the purpose and effect of

leaving the United States Treasury with a huge, uncollectable tax bill.  With the addition of

statutory interest and penalties, that tax liability is today more than $190 million.  This suit seeks

to recover those funds.

2.      The scheme was simple at its heart:  Deutsche Bank had acquired a corporation

that held stock with a very low cost-basis, such that the sale of this stock would trigger

approximately $150 million in taxable gain.  Deutsche Bank entered into an arrangement with a

firm (collectively and with two related individuals and certain entities, the "Promoter," and each

individually, a "Promoter") that created three shell corporations: defendants BMY Acquisition

Corp. ("BMY Corp."), BMY Acquisition LLC ("BMY LLC"), and BMY Statutory Trust ("BMY

Trust" and, collectively with BMY Corp. and BMY LLC, "BMY").  BMY was created to serve

as an underfunded special purpose vehicle left holding the bag when the taxes came due.

Through a series of pre-planned transactions, Deutsche Bank passed the appreciated stock from

one Deutsche Bank entity through BMY to another Deutsche Bank entity in order to trigger the

built-in tax liabilities while the stock was in BMY's hands.  Through these transactions,

Deutsche Bank attempted to make off with the stock with a stepped-up cost-basis, and BMY was

left insolvent and unable to pay the resulting tens of millions of dollars in taxes.

3.     To unravel this scheme and make the U.S. Treasury whole, the United States, *first*, seeks a judgment against BMY Corp. awarding the amount of BMY Corp.'s unpaid federal tax liability. *Second*, the United States brings actual and constructive fraudulent conveyance claims against the Deutsche Bank defendants, BMY, and First Union National Bank, as trustee of BMY Trust. The United States seeks a ruling with regard to these claims, pursuant to New York Debtor and Creditor Law ("NY DCL") sections 273, 274, 275, 276, 276-A, and 278, setting aside the conveyances of property (including funds) from BMY to the Deutsche Bank defendants to the extent necessary to satisfy BMY Corp.'s unpaid federal tax liability, allowing the satisfaction of BMY's debt from the transferred property or awarding the amount of taxes due, and awarding attorney's fees. *Third*, the United States brings a claim against the Deutsche Bank defendants for unjust enrichment.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1340 and 1345, and 26 U.S.C. § 7402.

5.     This action has been authorized by a delegate of the Secretary of the Treasury, and is brought at the direction of a delegate of the Attorney General of the United States, pursuant to the provisions of 26 U.S.C. § 7401.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because all defendants reside in this district within the meaning of 28 U.S.C. § 1391(c)(2) and under 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claims in this action occurred in this district.

3

PARTIES

7.     Plaintiff is the United States of America.

8.     Defendant DB AG is a German bank that conducts business in, among other places, the State of New York, and also maintains a branch in, among other places, London, England.

9.     Defendants DBUSH and DBSI are indirect subsidiaries of DB AG.  They each conduct business in the State of New York.

10.     Defendants BMY LLC, BMY Corp., and BMY Trust are special-purpose vehicles, formed on May 5, May 11, and May 12, 2000, respectively, for the sole purpose of facilitating the transactions at issue in this case.  BMY Corp.'s status, according to the Delaware Division of Corporation's website, is "void."  BMY LLC's status, according to the Delaware Division of Corporation's website, is "cancelled."  BMY Trust's status, according to the Connecticut Secretary of State's website, is "cancelled."

11.     Defendant First Union National Bank ("First Union") served as the trustee of BMY Trust at the time of the transactions at issue in this case.  First Union conducted business at 10 State House Square, Hartford, CT 06103-3698.  As a result of corporate transactions, First Union is currently known as Wells Fargo Bank, N.A.

FACTUAL ALLEGATIONS

A.  The Nature of the Tax Scheme

12.     As a general matter, when a taxpayer disposes of an appreciated capital asset, the taxpayer must pay tax on the difference between the amount realized from the disposition and its adjusted basis, *i.e.*, the capital gain. 26 U.S.C. §§ 1(h), 1001, 1011, 1012, 1221, 1222.  The

adjusted basis is the cost originally paid by the taxpayer, subject to certain adjustments permitted by tax law.

13.     Therefore, when a company owns appreciated stock, that stock has an implicit built-in tax liabilities affecting its economic value to the company and its shareholders.  The economic value of the stock to the shareholders of the company owning that appreciated stock is less than the market price of the stock.  Other factors being equal, the economic value of the stock is the market price less the taxes that will be due when the stock is sold.

14.     When appreciated stock is sold by one taxpayer to another, the first taxpayer realizes the capital gain and must report it as income.  The second taxpayer, in turn, takes the stock with a new, stepped-up cost-basis pegged at the sales price of the transaction.

15.     Here, Deutsche Bank, having acquired a company owning appreciated stock with a large built-in tax liabilities, attempted to evade that liability through a series of structured transactions.  Deutsche Bank caused one entity, DBUSH, to sell its shares of the company holding highly appreciated stock to a special purpose vehicle (BMY) without funds to pay the taxes pursuant to an arrangement requiring BMY to sell the stock to a second Deutsche Bank entity (DBSI, acting as agent for DB AG), in such a way as to cause BMY to become liable for tens of millions of dollars of tax that it could not afford to pay, and to allow Deutsche Bank to claim that it had acquired the stock with the new, higher basis.

16.     These series of transactions, separately and collectively, amounted to fraudulent conveyances.  Moreover, Deutsche Bank was unjustly enriched to the detriment of the United States as a result of these transactions.

B.  Deutsche Bank Acquires Stock with Large Built-In Tax Liabilities

17.     In the fall of 1999, Deutsche Bank was looking to profit from deals in which it would deliberately incur income that it could shelter from taxation.

18.     One vice president in Deutsche Bank's Structured Transactions Group found just such a deal for Deutsche Bank:  Deutsche Bank would acquire a holding company that held appreciated stock and find a way to obtain the benefit of the stock without paying the large built-in tax.  As this vice president explained in an email to the Tax Director for Deutsche Bank Americas, "[i]n accord with the broader income acceleration strategy that is underway, we have honed in [on] a particular personal holding company opportunity that will provide approximately $220 million in income (subject of course to market fluctuations)."

19.     Deutsche Bank's plan involved the Charter Corporation ("Charter").  Charter, a holding company for two individual shareholders, owned approximately three million shares of Bristol-Myers Squibb Company stock (the "BMY shares," with BMY referring to the company's stock ticker symbol), along with certain other assets of less interest to Deutsche Bank.  Charter had acquired its BMY shares many years earlier, for a very low cost-basis of less than one million dollars.  The sale of these shares, through the realization of this built-in gain, could have resulted in tens of millions of dollars of tax liabilities for the seller unless those liabilities were somehow avoided.

20.     On information and belief, Deutsche Bank initially expected that it would be able to acquire Charter but avoid paying the taxes on the built-in gain of the BMY shares because Deutsche Bank expected to have sufficient losses from other parts of its business to offset the gains. As a back-up plan, Deutsche Bank believed that it could achieve certain offsetting tax advantages through the use of a real estate investment trust ("REIT").

6

21.     Accordingly, on October 27, 1999, DB AG offered to buy all of Charter's corporate common stock from its then-owners, through a wholly owned but yet-to-be identified Deutsche Bank subsidiary.  DB AG ultimately determined that DBUSH would be the Deutsche Bank entity to purchase Charter's corporate stock.

22.     Between October 27, 1999, and February 25, 2000, Deutsche Bank and representatives of the Charter shareholders negotiated the terms of this sale.

23.     On February 25, 2000, the Charter shareholders and DBUSH entered into a stock purchase agreement, which was subsequently amended on March 10, 2000 ("Charter Stock Purchase Agreement").  This agreement provided that DBUSH would purchase all of the Charter stock for $149,910,896.36.

24.     The transactions called for by the Charter Stock Purchase Agreement closed on March 13, 2000.  When DBUSH acquired Charter, using money borrowed from another Deutsche Bank affiliate, Charter owned not only the BMY shares but also certain other assets (the "non-BMY assets").  At the time of the closing of the Charter Stock Purchase Agreement, Charter's individual shareholders and DBUSH entered into put, call, and escrow agreements designed, in essence, to keep control and ownership of the non-BMY assets in the hands of Charter's individual shareholders.

25.     The approximately $150 million purchase price paid by Deutsche Bank for the Charter stock was significantly greater than the economic value of the Charter stock if the built-in gain associated with the BMY shares owned by Charter are taken into account.  Deutsche Bank was willing to have DBUSH pay significantly more than fair value for the Charter stock only because it knew that it would evade payment of the tax on this gain.

C.  Deutsche Bank Turns to a Tax Scheme

26.     At some point in or before March 2000, Deutsche Bank determined that it would not offset the built-in gain associated with the BMY shares with other corporate losses, as it had originally planned to do.

27.     As a result, on information and belief, as of some point in March 2000, Deutsche Bank's back-up plan—using a REIT—was its intended option.  To effectuate this plan, on March 13, 2000, immediately after acquiring the Charter stock, Deutsche Bank conducted certain other transactions internal to Deutsche Bank, including a purported non-taxable exchange of property pursuant to Internal Revenue Code Section 351 between Charter (then owned by Deutsche Bank) and a Deutsche Bank entity named BT Lease Mortgage Corp. ("BT Lease"), causing BT Lease to own the BMY shares and Charter to own 100% of the preferred voting stock of BT Lease. Immediately thereafter, DB AG and another Deutsche Bank affiliate that was the holder of BT Lease's common stock, BT Corporation, entered into an option agreement relating to the BMY shares (the "BMY collar agreement").  The result of these transactions was that BT Lease was the owner of the BMY shares, subject to the BMY collar agreement.  All of these transactions, on information and belief, were connected to preparations for implementing the REIT structure.

28.     On information and belief, Deutsche Bank subsequently concluded that the REIT strategy was too risky because Deutsche Bank believed that in other cases this REIT strategy had been called into question by legal and tax authorities.

29.     This put Deutsche Bank in a difficult position.  It had acquired Charter to gain access to the BMY shares, which had tens of millions of dollars of built-in tax liabilities.  The market price of the stock—although fluctuating over time—was, as of March 2000, approximately $150 million, and the BMY shares had a basis of under one million dollars;

8

accordingly, assuming the applicability of a 34.5% tax rate, the federal tax liability associated

with the built-in gain of the BMY shares would have been greater than $51 million.  But

Deutsche Bank wanted to avoid paying these taxes, so it devised another scheme to evade doing

so.

30.     This time, Deutsche Bank turned to the plan actually adopted:  using a series of

fraudulent conveyances to evade the tax liabilities by leaving them with an insolvent shell-

company that would fail to pay its tax bill.

31.     Specifically, the plan was to restore the BMY shares to Charter; to transfer the

Charter corporate stock from DBUSH to the shell companies (BMY) and to cause the shell

companies to incur the built-in tax liabilities and to transfer the BMY shares from BMY to

DBSI, acting as agent for DB AG, with a stepped-up basis.  The shell companies, set up

specifically for this purpose and lacking assets sufficient to pay the tax liabilities, would default

on those liabilities, leaving the United States unable to collect tens of millions of dollars in taxes.

The benefit of not paying these taxes would substantially accrue to Deutsche Bank, including

DBUSH, DBSI, and DB AG.

32.     To effectuate this plan, Deutsche Bank worked with the Promoter, which, among

other things, created the shell companies.

33.     Solely for the purpose of these transactions, the Promoter created and controlled

BMY Corp., BMY LLC, and BMY Trust, the shell companies that would be—and were—left

insolvent but liable for the tax liabilities as a result of various conveyances made pursuant to this

scheme.

34.     DBUSH, DBSI, DB AG, and BMY knew (or should have known and were

willfully blind to the fact) that the entire purpose of the transactions was to leave the tax

9

liabilities with an entity other than Deutsche Bank in a manner that would hinder, delay, and defraud the United States as creditor of BMY.

35.     In more detail, the key steps leading to the evasion of these tax liabilities were the following:

            1)  Tax Shelter Step 1: Restore BMY Shares to Charter and DBUSH

36.     As described above, in anticipation of the REIT strategy, Deutsche Bank had caused Charter to transfer the BMY shares it held to BT Lease in a purported tax-free transfer pursuant to Internal Revenue Code Section 351.

37.     Around the time that Deutsche Bank abandoned the REIT strategy, it undertook a number of internal transactions. On April 12, 2000, BT Corporation, the holder of BT Lease's common stock, bought and contributed 7,800 BMY shares to BT Lease, using money borrowed from DB AG. BT Corporation contributed these 7,800 BMY shares to BT Lease, and BT Lease then entered into an option contract with DB AG's London Branch ("BMY option contract") to peg the value of these shares at a set price. Then, on April 28, 2000, BT Lease changed its name to Charter Lease Mortgage Corporation ("Charter Lease"). Finally, on May 17, 2000, BT Corporation assigned its rights under the BMY collar agreement and BMY option contract to Charter Lease. BT Corporation also sold all of the shares of Charter Lease to Charter for $1,000.

38.     After these interim steps, DBUSH again was the 100% indirect owner of the BMY shares, subject to the BMY collar agreement and BMY option contract. Specifically, DBUSH owned Charter; Charter owned Charter Lease; and Charter Lease owned the BMY shares, which remained subject to the BMY collar agreement and BMY option contract into which BT Lease had previously entered.

2) Tax Scheme Step 2: Create the Shell Companies and Fund the Transaction

39.    At the same time as Deutsche Bank was restoring the BMY shares to Charter and DBUSH, the Promoter was taking steps to create the shell companies that would be stuck with the tax liabilities.

40.    On April 24, 2000, Deutsche Bank informed the Promoter creating the shell companies that DBSI would be the Deutsche Bank subsidiary that would buy the BMY shares from the shell companies.

41.    On May 5, 11, and 12, 2000, respectively, the Promoter formed BMY LLC, BMY Corp., and BMY Trust, solely for the purpose of the transactions in this case.  These entities did not conduct any unrelated business.

42.    One of the individual Promoters was the President, Treasurer, and Secretary of BMY Corp.

43.    After the Promoter created BMY Corp., the Promoter caused BMY Corp. to become the sole member of BMY LLC.

44.    BMY LLC was created to be the grantor and beneficiary of the BMY Trust.

45.    BMY Trust's stated purpose was to obtain and sell the BMY shares and other Charter assets for the benefit of its beneficiary BMY LLC.  The trust agreement creating BMY Trust was signed by the second individual Promoter.

46.    BMY Corp.'s only material asset was its interest in BMY LLC; BMY LLC's only material asset was its interest in BMY Trust.

47.    Additionally, to fund BMY's purchase of Charter, on April 7, 2000, the Promoter requested a 30-day, $175 million loan from Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") on behalf of the yet-to-be formed entity that ultimately was created as BMY

11

Trust. This request stated that the loan would be used to buy all of the outstanding stock of Charter, and that after the acquisition, Charter would be liquidated and all of its assets immediately sold. It also explained that BMY Trust would pledge the stock of Charter as security to ensure repayment of the Rabobank loan.

48.     On May 17, 2000, the Utrecht-American Finance Company ("UAFC"), a specialized international branch of Rabobank, executed a promissory note to loan $175 million to BMY Trust (the "Rabobank loan"). The promissory note reflected that the Rabobank loan matured on June 16, 2000, and was conditioned upon various terms, including that BMY Trust use the funds only in connection with the acquisition of the Charter stock and demonstrate that it had entered into a purchase agreement whereby DBSI agreed to purchase the BMY shares from BMY Trust. Thus, the loan was contingent on the pre-determined result that BMY would buy the Charter Stock from Deutsche Bank and that Deutsche Bank would cause DBSI to purchase the BMY shares from BMY Trust.

   3)   Tax Scheme Step 3: Transfer the Charter Stock from DBUSH to BMY Trust for Less than Fair Consideration

49.     On May 17, 2000, DBUSH transferred its Charter shares to BMY Trust. BMY Trust significantly overpaid DBUSH for these shares—*i.e.*, BMY received less than fair consideration for what it paid.

50.     The transfer of the Charter shares to BMY Trust was principally implemented pursuant to a Stock Purchase Agreement (the "BMY Stock Purchase Agreement"), dated May 17, 2000, pursuant to which DBUSH agreed to sell the stock to BMY Trust for $167,067,556.12. The BMY Stock Purchase Agreement specified that the value of the non-BMY assets held by Charter at the time of this sale (plus $351,750.00 in preferred dividends of Charter Lease) was $22,479,478.76, with the difference—$144,588,077.36—therefore reflecting the amount paid by

12

BMY Trust attributable to the value of the BMY shares held by Charter. The sale of the Charter stock to BMY Trust closed on May 18, 2000.

51.     The BMY Stock Purchase Agreement also transferred DBUSH's rights and obligations under the BMY collar agreement and BMY option agreement.

52.     Among the parties to the BMY Stock Purchase Agreement were BMY Trust and its trustee, First Union, and BMY LLC.

53.     BMY LLC made various commitments as part of the BMY Stock Purchase Agreement. Among other things, BMY LLC agreed to instruct First Union to promptly take all actions required of BMY Trust under the terms of the BMY Stock Purchase Agreement. BMY LLC represented and warranted that all of the representations and warranties made by BMY Trust and First Union were true and correct. BMY LLC also ratified and approved the BMY Stock Purchase Agreement and the execution, delivery, and performance of it by BMY Trust and First Union.

54.     BMY Trust obtained the funds to purchase the Charter shares pursuant to the Rabobank loan.

55.     BMY Trust substantially overpaid DBUSH for the Charter shares. At a minimum, the sales price did not account for the tax liabilities associated with the built-in gain on the BMY shares owned by Charter. The price only makes sense in connection with an intent not to pay the tax liabilities.

56.     Moreover, the price paid by BMY Trust for the Charter shares may have been inflated by an additional amount as a result of other features of the overall set of transactions, including the encumbrance of the BMY shares by the BMY collar agreement and BMY option contract.

13

57.     This transfer was conducted in bad faith and with the intent of hindering,

delaying, and defrauding the United States as creditor of BMY.

> 4) Tax Scheme Step 4: Cause BMY Trust (and BMY Corp., as Taxpayer) to
> Incur the Built-In Tax Liabilities While Transferring the BMY Shares to
> DBSI, as Agent for DB AG, Without Fair Consideration

58.     Once the Charter shares were transferred to BMY Trust, the final critical step in

Deutsche Bank's tax scheme was for BMY Trust to sell the BMY shares to DBSI, as agent for

DB AG.

59.     In order to bring about the conveyance of the BMY shares to DBSI, as agent for

DB AG, a number of subsidiary transactions were conducted in order to make BMY Trust the

direct owner of the BMY shares.  Among other things, Charter Lease was dissolved, and its

assets (including 3,173,942 BMY shares) were assigned and distributed to its sole stockholder,

Charter.  Then, Charter was liquidated into BMY Trust.  As a result of these transactions, BMY

Trust became the direct owner of the BMY shares.

60.     Additionally, BMY Trust caused the exercise of the put option associated with the

non-BMY assets held by Charter when it was acquired by DBUSH, and assigned those assets to

the original individual Charter shareholders.  As a result, the only original Charter assets still

owned by BMY Trust were the BMY shares.

61.     On May 18, 2000, DBSI, as agent for DB AG, purchased the 3,173,942 BMY

shares (consisting of the original 3,166,142 BMY shares originally held directly by Charter and

the 7,800 BMY shares that, as noted above, were contributed to BT Lease (which became

Charter Lease) by BT Corporation), from BMY Trust for $151,398,638.64.  This sales price was

reduced from market price by nearly $30 million purporting to reflect an adjustment pursuant to

the BMY collar agreement and BMY option contract, and further reductions to the sales price were made for claimed finance charges.

62.    The sales price paid by DBSI to BMY did not reflect the built-in tax liabilities incurred by BMY, even though incurring this liability was part and parcel of the transaction.  No reasonable party in BMY's position intending to pay this tax liabilities would have sold the BMY shares for the price that DBSI, as agent for DB AG, paid.

63.    Moreover, the price paid by DBSI for the BMY shares additionally may not have been reasonably equivalent to the value of the BMY shares because of purchase-price reduction purportedly taken to account for the BMY collar agreement and BMY option contract and finance charges.

64.    BMY and DBSI, acting as agent for DB AG, intended for BMY to incur the taxable gain on the BMY shares as a result of this sale.  The entire series of transactions that took place in May 2000 were structured to cause this to occur, and the sale of BMY shares to DBSI would not have occurred absent BMY's incurring of this taxable gain.

65.    As intended by the parties to the transaction, BMY incurred substantial tax liabilities as a result of the built-in gain on the BMY shares due to the sale of the shares to DBSI.

66.    Deutsche Bank and BMY knew or should have known (and were willfully blind to the fact) that as a result of this transaction, BMY would not be able to pay the tax liabilities arising as a result of the sale of the BMY shares to DBSI.

67.    After receiving the funds from DBSI, BMY Trust repaid the Rabobank loan it had used in the first instance to purchase the Charter stock from DBUSH.

68.     After the completion of the sale of the BMY shares to DBSI, the Promoter received several million dollars in compensation for its services in connection with these transactions.

69.     The sale of the BMY shares to DBSI was conducted in bad faith and with the intent of hindering, delaying, and defrauding the United States as creditor of BMY.

5)  Result of the Tax Scheme:  BMY Is Left with Tax Bill It Cannot Pay While Deutsche Bank Benefits

70.     As a result of this tax scheme, Deutsche Bank avoided paying tens of millions of dollars of taxes by being able to claim the stepped-up basis when it ultimately sold the BMY shares.

71.     As specified below, BMY Corp. was left with a federal tax liability that, prior to interest and penalties, amounted to $52,828,853.00.

72.     After the repayment of the Rabobank loan, little or no money remained in BMY.

73.     The BMY entities were left with no income or material assets other than the BMY shares, and thus were insolvent and unable to pay the federal tax liability incurred by BMY Corp. as a result of the transaction.

D.  Taxes Due By BMY Corp.

74.     On July 26, 2001, BMY Trust filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, for the period March 12, 2000, through April 30, 2001.  BMY Trust indicated that it was a grantor trust, and that all of its income and expenses flowed through to BMY LLC, BMY Trust's sole beneficiary.

75.     BMY LLC is disregarded for federal tax purposes.  Accordingly, its income is deemed to be incurred by its sole member, BMY Corp.

16

76.     BMY Corp. filed a Form 1120, U.S. Corporation Income Tax Return, on July 18, 2001, for the period May 11, 2000, through April 30, 2001.  The income reported on this return included $170,460,894.00 of flow-through income from BMY Trust (which had flowed through from BMY LLC).  This income reflected the gain derived from the sale of the BMY shares and Charter's non-BMY assets.

77.     BMY Corp. also reported a flow-through loss of $173,448,259.00, from BMY Trust, along with $50,000.00 of expenses for legal fees, resulting in a net taxable loss of $3,037,365.00.  The purported $173,448,259.00 loss—just exceeding the precise amount necessary to offset the reported gain from the sale of the BMY shares and the non-BMY assets— allegedly arose from a foreign currency loss involving 615,200 Euros with a purported fair market value of $550,455.00 and cost-basis of $171,232,043.00, as well as certain expenses and fees.  The Euros were obtained by BMY Corp. on May 18, 2000, from entities related to the Promoter.  Immediately thereafter, BMY Corp. assigned these Euros to BMY LLC, which in turn assigned them to BMY Trust.  These steps involving the Euros were taken specifically for the purpose of creating artificial losses from an abusive tax shelter with which to offset the gain triggered on the same day by the sale of the BMY shares to DBSI.

78.     On July 16, 2004, the IRS issued a notice of deficiency to BMY Corp., disallowing the purported foreign currency losses for the reasons stated in the notice of deficiency including because the taxpayer did not establish the existence of the losses, the basis of the foreign currency, or that any section of the Internal Revenue Code allowed BMY Corp. to claim these losses.  The IRS also disallowed the additional claimed expenses for lack of substantiation.  The IRS asserted a deficiency in income tax of $59,854,563.00 and an accuracy-

17

related penalty pursuant to Internal Revenue Code § 6662 of $23,744,525.20.20, for the period from May 11, 2000, through April 30, 2001.

79.     BMY Corp. did not challenge the notice of deficiency, and, on December 9, 2004, the IRS assessed the deficiency of $59,845,563.00 and the accuracy-related penalty amount of $23,744,525.20.  Interest on these amounts continues to accrue as provided by law.

80.     The IRS had issued a prior notice of deficiency to Charter on November 20, 2003, for the tax year ended on March 13, 2000.  That dispute was resolved by a consensual assessment of approximately $3 million in taxes, plus interest, relating to taxable gain associated with the non-BMY assets.  The holding company for DB AG's United States affiliates, Taunus Corp., paid this tax on behalf of Charter.

81.     In light of the assessment against, and payment on behalf of, Charter, the IRS is abating the assessment against BMY Corp. to the extent that it relates to the non-BMY assets, and related penalties and interest.  This abatement—which limits the remaining federal tax liability of BMY Corp. to that stemming from the capital gain arising from the sale of the BMY shares—will result in a reduction of gain and interest attributable to BMY Corp. from $170,460,894.00 to $150,387,437.00, and a reduction of tax due for the tax year ending April 30, 2001, from $59,845,563.00 to $52,828,853.00.  The revised accuracy-related penalty amount is $21,131,541.00.  With penalties and interest, as of November 30, 2014, the unpaid tax liability (plus fees and costs) is $190,209,342.91, with interest continuing to accrue as provided by law.

CLAIMS FOR RELIEF

COUNT I: COLLECT UNPAID FEDERAL TAX LIABILITY
(against BMY Corp.)

82.     The United States repeats and realleges the allegations in paragraphs 1 through 81 with the same force and effect as if set forth fully herein.

18

83.     The IRS timely assessed BMY Corp.'s income taxes for the fiscal year ended April 30, 2001, on December 9, 2004, and thereafter made additional assessments of interest and penalties for that tax year.

84.     With the abatement referred to above, as of November 30, 2014, BMY Corp.'s unpaid federal income tax liability for the fiscal year ending April 30, 2001, was $190,209,342.91.

85.     Interest on BMY Corp.'s unpaid federal income tax liability for the fiscal year ending April 30, 2001, continues to accrue as provided by law.

86.     Accordingly, pursuant to 26 U.S.C. § 7402(a), the United States is entitled to a judgment in the amount of BMY Corp.'s unpaid federal tax liability for the fiscal year ending April 30, 2001.

## COUNT II: ACTUAL FRAUDULENT CONVEYANCE
### (against all defendants)

87.     The United States repeats and realleges the allegations in paragraphs 1 through 81 with the same force and effect as if set forth fully herein.

88.     Defendants entered into conveyances, and caused tax liabilities to be incurred by BMY Corp., with the actual intent to hinder, delay, and defraud the United States as creditor of BMY Corp.

89.     These conveyances include the May 17, 2000, sale of Charter stock from DBUSH to BMY Trust and the May 18, 2000, sale of the BMY shares from BMY Trust to DBSI, acting as agent for DB AG.

90.     These conveyances, on their own and collapsed as a single transaction, involved the transfer of property (including funds) to and from BMY Trust in amounts that are only economically rational if the tax liabilities associated with the BMY shares is disregarded.

19

91.     The parties to these conveyances were sophisticated corporate actors who were well aware of the tax implications of the transactions.

92.     These conveyances were made without fair consideration.

93.     These conveyances were questionable transfers not made in the ordinary course of business.

94.     A close relationship existed between certain of the parties to these conveyances.

95.     The BMY entities were shell companies created and used solely for the purpose of these conveyances.

96.     In the context of the conveyances between BMY and Deutsche Bank, the BMY entities should be treated as a single entity.

97.     As principal, DB AG is liable for the acts of, and liabilities incurred by, its agent DBSI.

98.     Each of the parties to the conveyances knew or should have known that BMY Corp. would incur tax liability to the United States that it would not be able to pay.  To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of circumstances that should have led to further inquiries that would have provided such knowledge.

99.     Each of the parties to the conveyances knew or should have known that these conveyances would hinder, delay, and defraud the United States.  To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of

20

circumstances that should have led to further inquiries that would have provided such

knowledge.

100.    Accordingly, pursuant to NY DCL Sections 276 and 278, to the extent necessary

to satisfy the United States' federal tax claim against BMY Corp., the United States is entitled to

judgment against all defendants (i) setting aside the conveyances; (ii) disregarding the

conveyances and allowing the United States to attach or levy execution upon property conveyed;

and (iii) awarding it the value of the property, including interest or appreciation, to the maximum

extent allowed by law.

101.    Additionally, pursuant to NY DCL Section 276-A, the United States is entitled to

judgment awarding reasonable attorney's fees for this action.

COUNT III: CONSTRUCTIVE FRAUDULENT CONVEYANCE
(against all defendants)

102.    The United States repeats and realleges the allegations in paragraphs 1 through 81

with the same force and effect as if set forth fully herein.

103.    The conveyances of property, including any funds, from BMY to DBUSH and

from BMY to DBSI, whether viewed as two separate conveyances or collapsed into one

overarching transaction, were constructive fraudulent conveyances.

104.    First, the conveyance of property from BMY to DBUSH was made without fair

consideration.

105.    When BMY conveyed property to DBUSH, BMY was engaged in, or about to

engage in, a transaction for which the property remaining in its possession after the conveyance

was unreasonably small capital.

106.    When BMY conveyed property to DBUSH, BMY intended or believed that it

would incur debts beyond its ability to pay as they mature.

21

107.     Second, the conveyance of property from BMY to DBSI, as agent for DB AG, was made without fair consideration.

108.     BMY was rendered insolvent by the conveyance of property from BMY to DBSI, as agent for DB AG.

109.     When BMY conveyed property to DBSI, as agent for DB AG, BMY was engaged in, or about to engage in, a transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

110.     When BMY conveyed property to DBSI, as agent for DB AG, BMY intended or believed that it would incur debts beyond its ability to pay as they mature.

111.     Third, collapsing all of the transactions conveying property from BMY Trust to Deutsche Bank, the conveyances collectively were made without fair consideration.

112.     BMY was rendered insolvent by the conveyances to Deutsche Bank, considered collectively.

113.     At the time of the conveyances to Deutsche Bank, considered collectively, BMY was engaged in, or about to engage in, a transaction for which the property remaining in its possession after the conveyance was unreasonably small capital.

114.     At the time of the conveyances to Deutsche Bank, considered collectively, BMY intended or believed that it would incur debts beyond its ability to pay as they mature.

115.     In the context of each of the conveyances between BMY and Deutsche Bank, the BMY entities should be treated as a single entity.

116.     As principal, DB AG is liable for the acts of, and liabilities incurred by, its agent DBSI.

117.    Accordingly, pursuant to NY DCL Sections 273, 274, 275, and 278, to the extent necessary to satisfy the United States' federal tax claim against BMY Corp., the United States is entitled to judgment against all defendants (i) setting aside the conveyances; (ii) disregarding the conveyances and allowing the United States to attach or levy execution upon property conveyed; and (iii) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law.

COUNT IV: UNJUST ENRICHMENT
(against DB AG, DBUSH, and DBSI)

118.    The United States repeats and realleges the allegations in paragraphs 1 through 81 with the same force and effect as if set forth fully herein.

119.    As a result of the transactions at issue in this complaint, DB AG, DBUSH, and DBSI were enriched.

120.    DB AG, DBUSH, and DBSI were enriched at the expense of the United States.

121.    Equity and good conscience militate against permitting DB AG, DBUSH, and DBSI to retain the funds necessary to pay the unpaid federal tax liability.

122.    Accordingly, the United States is entitled to judgment against DB AG, DBUSH, and DBSI in the amount of BMY Corp.'s unpaid federal tax liability, including penalties and interest, for the fiscal year ending April 30, 2001.

23

## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter judgment as follows:

1.      As against BMY Corp., awarding the amount of BMY Corp.'s unpaid federal tax liability, pursuant to 26 U.S.C. § 7402(a);

2.      As against all defendants, pursuant to NY DCL sections 273, 274, 275, 276, and 278, setting aside the conveyances of property (including funds) from BMY to the Deutsche Bank defendants to the extent necessary to satisfy BMY Corp.'s unpaid federal tax liability; allowing satisfaction of BMY Corp.'s unpaid federal tax liability from the transferred property (including funds); and awarding, up to the amount of BMY Corp.'s unpaid federal tax liability, the value of the transferred property (including funds), including interest or appreciation, to the maximum extent allowed by law;

3.      As against all defendants, awarding fees as provided by NY DCL 276-A;

4.      As against the Deutsche Bank defendants, awarding the amount of BMY Corp.'s unpaid federal tax liability on the United States' unjust enrichment claim; and

5.      Awarding such further relief as is proper.

Dated: December 8, 2014
       New York, New York

PREET BHARARA
United States Attorney

By: _____
ROBERT WILLIAM YALEN
ELLEN LONDON
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2722/2737
Fax:   (212) 637-2702
Email: robert.yalen@usdoj.gov
         ellen.london@usdoj.gov

Attorneys for the United States of America

24